UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

WILLIAM ANDREW DENNIS,

    Defendant.
_____/

Case No. 17-cr-20056
HON. MARK A. GOLDSMITH

**OPINION AND ORDER**
**DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS (Dkt. 17)**

This matter is before the Court on Defendant William Andrew Dennis's motion to suppress statements (Dkt. 17). The issue has been briefed, and the Court held a hearing on April 4, 2017. For the reasons discussed below, the Court denies Dennis's motion.

**I. BACKGROUND**

Dennis first came to the attention of authorities during an investigation into drug trafficking activity by Demarco Tempo. Gov. Resp. at 4 (Dkt. 24). Tempo is the half-brother of Dennis's late son, William Dennis, Jr., and the head of an alleged drug trafficking organization. 4/4/2017 Hr'g Tr. at 5-6 (Dkt. 28). Dennis was linked to Tempo's organization on two occasions prior to his arrest.

In March 2016, officers observed Dennis at a vacant home on Strasburg in Detroit, Michigan, known to authorities as a primary stash location for the organization. Gov. Resp. at 5. During a June 2016 search of the home, officers discovered a deed, reflecting that Dennis had conveyed the home to a member of Tempo's organization. 4/4/2017 Hr'g Tr. at 7. Based on this

1

association with Tempo's organization, as well as information from two sources regarding Dennis's own drug trafficking activity, officers with the Warren Police Department obtained a search warrant for Dennis's home. Gov. Resp. at 4.

The warrant was executed on December 6, 2016. Id. at 6. In addition to finding $2,000 and crack cocaine on Dennis's person, officers discovered two grams of crack cocaine, over 23 grams of marijuana, a digital scale, and three firearms in the home. Id. While Dennis was originally charged in a Michigan state court, a federal complaint was issued on January 13, 2017. 4/4/2017 Hr'g Tr. at 8.

Dennis was subsequently arrested on January 18, 2017. Id. Prior to his arrest, Eric Lindblade, a task force officer with the Drug Enforcement Administration ("DEA"), conducted surveillance outside of Dennis's home in tandem with Warren police officers. Id. at 9. After Lindblade observed Dennis leave the home in his vehicle, Lindblade instructed Warren police officers to arrest him, which they did. Id. Dennis was then transferred to the DEA office in Detroit. Id. at 10.

It was at this office where Lindblade first encountered Dennis. Id. Lindblade began by conducting a secondary pat-down of Dennis, during which he discovered a large amount of money in a plastic bag. Id. Without prompting from Lindblade, Dennis stated that the money was from a vehicle he sold in order to pay his attorney in the pending Michigan case. Id. at 10-11.

Lindblade then asked Dennis if he understood why he was in DEA custody. Id. at 11. Dennis responded that he believed it was related to his pending state court case, for which a hearing was scheduled the following day. Id. Lindblade informed Dennis that the case had been taken over by the federal government. Id. To Lindblade's knowledge, Dennis had not been read his Miranda rights at any point during the course of his arrest. Id. at 13.

After Dennis was fingerprinted and photographed, he was handcuffed and placed into Lindblade's vehicle in order to be transferred to the federal courthouse. Id. at 13-14. About a minute into the ride, Dennis began talking about how his son had been killed by a man named "Kenny." Id. at 16-17. In response, Lindblade asked who Kenny was; Dennis stated that he was referring to Kenneth Sadler, a member of Tempo's organization. Id. at 17. Lindblade then asked Dennis why he believed Sadler was responsible for William Jr.'s death. Id. at 18. Dennis stated that Sadler did not like that William Jr., who was younger than Sadler, was assisting a man named "Polo" with his drug trafficking organization. Id. at 19. Lindblade then asked who Polo was, and was informed that Polo was Tempo's nickname. Id. In an effort to find out more about Tempo, Lindblade asked again who Polo referred to, and Dennis confirmed again that it was Tempo. Id. at 19-20.

Dennis continued elaborating about Tempo, insisting that he never sold him drugs. Id. at 20. Dennis reiterated his belief that William Jr. was killed because members of Tempo's organization, including Sadler, were jealous that William Jr. was given a leadership role after Tempo was incarcerated. Id. Dennis also stated that he never sold or bought drugs from Tempo, and that his relationship to Tempo was limited to fixing up the home on Strasburg. Id. at 20-21. Dennis then stated that Tempo's organization sold heroin and crack cocaine, but that he only sold crack cocaine and he only had one customer. Id. at 25.

After attempting to distance himself from Tempo, Dennis began explaining the presence of the firearms that were found in his home. Id. at 26. Dennis informed Lindblade that the firearms belonged to William Jr. and that they had been taken out of storage and brought to Dennis's home a couple days prior to the execution of the search warrant on December 6, 2016. Id. at 27. Dennis

did not say who brought the firearms out of storage, only that he knew they were located somewhere in his home. Id.

## II. ANALYSIS

"Under the Fifth Amendment, a suspect is guaranteed the right to remain silent and the right to assistance of counsel during a custodial interrogation." Tolliver v. Sheets, 594 F.3d 900, 916 (6th Cir. 2010). "[T]he prosecution may not use statements obtained through custodial interrogation in the absence of the specific rendering of the Miranda warning." Id. at 917. "'Interrogation' includes 'express questioning or its functional equivalent.'" Id. (quoting Rhode Island v. Innis, 446 U.S. 291, 300-301 (1980)). "The 'functional equivalent' of express questioning includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" Id. (quoting Pennsylvania v. Muniz, 496 U.S. 582, 600-601 (1990)). However, "'[v]olunteered statements of any kind are not barred by the Fifth Amendment.'" United States v. Woods, 711 F.3d 737, 741 (6th Cir. 2013) (quoting Miranda v. Arizona, 384 U.S. 436, 478 (1966)).

"The line between impermissible interrogation and permissible follow-up questions to volunteered statements is a fine one. Police may listen to volunteered statements, and need not interrupt a suspect who is volunteering information in order to deliver a Miranda warning." Tolliver, 594 F.3d at 920. Further, authorities are permitted to "interrupt a volunteered statement or to ask clarifying or follow-up questions." Id. The Sixth Circuit has held that "[t]he difference between permissible follow-up questions and impermissible interrogation clearly turns on whether the police are seeking clarification of something that the suspect has just said, or whether instead the police are seeking to expand the interview." Id. at 921.

The Government does not contest that Dennis was in custody at the time he made his statements, and that he had not been advised of his Miranda rights. Therefore, the statements may not be admitted if they were made in response to interrogation. Dennis contends that the statements he made while being transported to the courthouse were in response to Lindblade's initial inquiry at the DEA office regarding whether Dennis knew why he had been arrested. However, even assuming such a question could be characterized as part of an interrogation, Dennis's statements were made independently of the question and were clearly nonresponsive to it. See United States v. Cole, 315 F.3d 633, 637 (6th Cir. 2003) ("Because the record reflects that Cole's statements while being booked and later transported to jail were spontaneous and unprovoked by Officer Jones's initial question at the scene of the crime, the initial Miranda violation furnishes no basis to suppress the subsequent statements.").

All of the statements made by Dennis while being transported to the courthouse are properly characterized as volunteered statements or statements made in response to permissible follow-up questions by Lindblade. Dennis began the car ride by volunteering that William Jr. had been killed by a man named "Kenny." His subsequent statements that "Kenny" referred to Sadler, and that Sadler was motivated by jealousy over William Jr.'s role in Tempo's organization, were made in response to Lindblade's attempt to clarify Dennis's volunteered statement. Dennis's statement that "Polo" referred to Tempo was also in response to Lindblade's attempt to clarify Dennis's assertion regarding William Jr.'s murder.

Dennis's statements regarding his own relationship with Tempo were also voluntary and were clearly meant to be exculpatory. He stated that his relationship with Tempo was limited to fixing up the home on Strasburg and that, unlike Tempo, he only sold crack cocaine to one customer. Finally, Dennis's statement regarding the firearms in his home was also made

5

voluntarily and was a further attempt to distance himself from the charged crimes. Because Dennis's statements were not in response to custodial interrogation, their admission does not violate his rights under the Fifth Amendment. Tolliver, 594 F.3d at 920-921.

### III. CONCLUSION

For the foregoing reasons, the Court denies Dennis's motion to suppress statements (Dkt. 17).

SO ORDERED.

Dated: May 30, 2017       s/Mark A. Goldsmith
   Detroit, Michigan      MARK A. GOLDSMITH
     United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 30, 2017.

     s/Karri Sandusky
     Case Manager